FILED
2016 Nov-03  AM 10:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN E. LYERLY AND SHARON LYERLY, | ) ) ) | |
| Plaintiffs; | ) ) ) | 2:15-cv-745-LSC |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF OPINION

Before the Court are Plaintiffs' Motion for Summary Judgment (doc. 27), Defendant's Motion for Summary Judgment (doc. 29) and Plaintiffs' Motion to Strike Evidence (doc. 34). Plaintiffs, Jonathan and Sharon Lyerly, brought this case based on tax penalties that they allege were wrongfully assessed by the Internal Revenue Service ("IRS"). The Lyerlys seek a refund of overpayments, damages, and a declaration of their correct tax liability. For the reasons stated below, Plaintiffs' motion for summary judgment is due to be granted in part and denied in part.

Defendant's motion is due to be denied. Plaintiffs' motion to strike is due to be denied as moot.[1]

## I.   Background

Jonathan ("Rick") and Sharon Lyerly (collectively "the Lyerlys") are a married couple living in Hoover, Alabama. Rick is an attorney with a general practice who does not do any tax or bankruptcy work. Rick suffers from many health problems, including diabetes, high blood pressure, a broken hip, a hernia, a prostate problem that required surgery, five heart bypass surgeries, internal bleeding, panic attacks, and anxiety. His anxiety is apparently tied to dealing with financial matters and sometimes manifests itself as shortness of breath, sweating, shaking, and almost losing consciousness. In 2009, Rick began to take Klonopin for his anxiety, which helped reduce these symptoms dramatically. Because of this anxiety, Rick relied almost entirely on others to take care of his financial matters, including filing his tax returns. He delegated this responsibility to Doug Hill ("Hill"), his accountant, and various office managers that he employed. Rick expected his office managers to gather and transmit financial information to Hill, who would then prepare his tax returns. Rick would simply sign his tax returns, apparently without

---

[1] The Court did not consider the evidence that Plaintiffs object to in their motion to strike. Therefore, the motion to strike will be deemed moot.

reading them.

Mary Dobbs served as Rick's office manager until April 2007. She apparently did not attend to the tax matters that Rick had assigned her. She was then replaced by Joy Simeone ("Simeone"), who also did not handle Rick's tax matters appropriately. In fact, Rick alleges that Simeone embezzled from him and destroyed or altered his financial records. However, she also sent a memo to Rick in September 2007 about problems that the firm was having in complying with tax obligations. Simeone was fired in July 2008 when Rick discovered her embezzlement. Sharon then attempted to gather the necessary financial information herself for submission to Hill. However, she found this to be difficult because of the damage Simeone had done to Rick's records.

### A. Criminal Trial

For the years 2005, 2006, and 2007, Rick failed to file tax returns with the IRS. Rick alleges, and the IRS disputes, that he always intended to file these returns. While the IRS claims that Rick knew he was late in filing his taxes, Rick contends that he thought his tax returns were covered by "extensions" because Hill never told him otherwise. According to Rick, he did not know his taxes were overdue until Jason Ward, an IRS criminal investigator, visited him on August 27, 2009.

During that visit, Rick told Ward that he thought the returns had been handled, but that he would check with Hill to make sure. Rick also told Ward that he was welcome to speak to Hill if he wanted more information about Rick's taxes, and even told Hill to cooperate with Ward and to give him "whatever he asked for." (Pl. Ex. 6 at 310.) Rick explained that he kept his financial records on Microsoft Money and instructed his secretary to put the records on a CD and give it to Ward. The next day, Ward went to Hill's office, talked to Hill, and collected some of Rick's records. Ward also visited and spoke to Dr. Bair, the psychologist who was treating Rick for his anxiety issues. Dr. Bair informed Ward that Rick had been diagnosed with "simple phobia and anxiety disorder primarily focused around financial matters." (Pl. Ex. 4 at 151.)

On October 10, 2012, the United States filed an information against Rick in the United States District Court for the Northern District of Alabama, alleging three counts of willful failure to file income tax returns for the years 2005, 2006, and 2007. During the criminal trial, Sharon and Rick testified that Rick had filed his taxes for these years on October 14, 2010, and that the delay in filing was not willful, but rather, was for "reasonable cause." Rick was found not guilty of all three counts on August 9, 2013.

### B. 2005 Taxes

Even though Rick filed his 2005 tax return in 2010, he did not pay his taxes for that year until September 20, 2012, when he mailed the IRS a check "For 2005 Tax/Estimated Penalties." (Pl. Ex. 16 at 2.) The IRS replied to his payment on December 10, 2012 with a letter stating that Rick owed $5,273.83 for the year 2005 for "penalties and interest figured to December 31, 2012." (Pl. Ex. 17 at 1.) Rick responded by sending the IRS a check on December 29, 2012 marked "For 2005/2007 Taxes" in the amount of $8,962.69, enough to cover the $5,273.83 he owed on his 2005 taxes and the $3,688.46 he owed on his 2007 taxes. (Pl. Ex. 19.) The IRS applied this payment to Rick's 2006 taxes because, according to the United States, he submitted the check with a 2006 payment voucher. Rick, however, argues that the IRS misapplied the check and therefore created a credit balance of $8,962.69 for the year 2006 which was never corrected. Rick also claims that if the check had been correctly applied, the taxes for the year 2005 would have been paid in full with a credit balance in his favor.

On September 9, 2013, the IRS sent the Lyerlys a letter stating that Rick still owed $5,384.20 on his 2005 taxes. On October 4, 2013 Rick replied, explaining that the IRS had misapplied his December 29, 2012

payment. Jacquelyne Yarbrough, an accounts manager with the IRS, responded to Rick's letter, stating that "we have not completed all the research necessary for a complete response . . . You don't need to do anything further now on this matter." (Pl. Ex. 24.) She also stated that the IRS would contact him within 45 days about the matter. (*Id.*) However, the IRS never followed up with Rick or changed the application of that payment.

### C. 2006 Taxes

On August 27, 2012, the Lyerlys received a notice from the IRS that showed an outstanding balance of $35,853.14 on their 2006 taxes. (Pl. Ex. 29.) The notice stated "[s]end us the amount due . . . by September 17, 2012, to avoid additional penalty and interest charges." (*Id.*) Rick paid the outstanding balance by check on September 7, 2012. The December 10, 2012 letter from the IRS listing the Lyerlys' outstanding obligations showed a balance remaining for the tax years of 2005 and 2007, but did not show there was any balance remaining for 2006.

### D. 2007 Taxes

Rick sent the IRS a check for $25,440 on September 20, 2012 with a memo that the payment was for "2007 Tax/Estimated Interest." (Pl. Ex. 16.) The IRS responded on December 10, 2012 stating that "[t]he amount

[Rick] owe[d] for the tax period . . . includ[ing] penalties and interest figured to Dec. 31, 2012" was $3,688.46. (Pl. Ex. 17.) On December 29, 2012, Rick sent the IRS a check for $8,962.69, which included the $3,688.46 which he owed for his 2007 taxes and $5,273.83 that he owed for his 2005 taxes. The check was labeled "For 2005/2007 Taxes", but the IRS applied this payment to Rick's 2006 taxes. The United States argues that they correctly applied the check to the 2006 taxes because Rick submitted the payment with a 2006 payment voucher. However, Rick alleges that if the check had been rightfully applied to the 2007 taxes, the 2007 account would have been paid in full and would show a credit balance in his favor of $1,492.40.

On May 13, 2013, the Lyerlys received notice from the IRS that an overpayment of $6,989 from their 2012 taxes was applied to their 2007 account, leaving a balance of $22,644.28 on their 2007 account. Rick alleges that this means that his September 20, 2012 and December 29, 2012 payments had never been applied to his 2007 taxes. Regardless, the parties dispute what taxes Rick properly owed for 2007.

### E. 2008 Taxes

The Lyerlys filed their 2008 tax return on time and submitted a payment of $16,228 on October 19, 2009. However, the payment was not

immediately posted to the Lyerlys' account, according to an IRS report, "due to the module being frozen by Criminal Investigation." (Pl. Ex. 41.) On June 16, 2014, the Lyerlys received an IRS notice showing a balance of $4,905.09 on their 2008 account. This notice showed failure to file, failure to pay proper estimated tax and failure to pay penalties as well as interest. (Pl. Ex. 43.) On September 1, 2014, the Lyerlys received another notice that they owed $4,936.23 for 2008 taxes. (Pl. Ex. 44.) Rick paid that balance by check on September 9, 2014. (Pl. Ex. 45.)

The Lyerlys allege that the penalties were wrongful, but the United States claims that their payments were both late and inadequate. According to the United States, the Lyerlys should have paid a higher estimated tax amount, and should have paid by April 15, 2009 instead of in October 2009.

### F. Assessment of Penalties

The IRS transferred Rick's case to Maria Flournoy ("Flournoy") and her supervisor Dorothy Randle ("Randle") on August 26, 2013. While the case was Flournoy's responsibility, the case file was updated with a Civil Penalty Approval Sheet which stated that "Failure to File and Failure to Pay penalties were considered and determined to be inapplicable . . . no penalties will be asserted by exam in tax years 2005 through 2007." (Pl.

Ex. 13.)   From October 1, 2013 until October 17, 2013, the federal government was shut down, and federal employees, including those employed by the IRS, were ordered not to report to work. The Lyerlys claim that this resulted in IRS employees not being allowed to do any work. The United States asserts that "the IRS was required to continue taking action to protect the United States' property interests including making assessments prior to statute expirations as required by law." (Doc. 38 at 6.)

The Lyerlys received two letters dated October 3, 2013 from Randle, which stated that the IRS had "completed the review of the examination of [the Lyerlys'] tax return for the year(s) [2005, 2006, and 2007]." (Pl. Ex. 14.) One of these letters showed no penalties and no interest for the year 2006, and the other showed no penalties and no interest for the years 2005 and 2007. (*Id.*) However, Rick then received a notice dated October 9, 2013 of penalties and interest which had been assessed for 2005 and 2006. (Pl. Ex. 25 & 32.) As a result, the Lyerlys met with Randle on October 30, 2013 to clear up the obvious inconsistencies in the IRS's communications. Randle told the Lyerlys that she would investigate the matter, and that the Lyerlys should call her back in four to six weeks.

While the Lyerlys were at the IRS office on October 30, they obtained

a copy of their account transcript for 2005 and 2006, and found that the penalties allegedly assessed on October 9, 2013 were not on the transcript. (Pl. Ex. 26 & 33.) The parties do not dispute that these assessments were logged onto the computer record between October 30, 2013 and November 19, 2013. As a result, the Lyerlys claim that the penalties were assessed after the October 14, 2013 statute of limitations had expired. However, the United States insists that quick assessments are not always immediately logged onto account records. The Lyerlys and the United States also dispute whether proper procedures for assessing these penalties were followed. For example, the Lyerlys claim that the required forms were not completed and filed prior to this assessment and that they did not receive notice and an opportunity to provide an explanation.

### G. Payment of Penalties

On April 15, 2014, the Lyerlys filed a joint tax return for 2013, showing an overpayment of $19,731, which they requested be credited to their 2014 taxes. The IRS sent back a notice that they had applied some of the overpayment to the Lyerlys' 2005 taxes. However, the Lyerlys maintain that they did not owe money on their 2005 taxes.

On September 1, 2014, Rick received an IRS notice of intent to levy

which stated that he owed a total of $9,913 for the year 2005 and $6,003.52 for 2006. This sum included penalties, interest, and the outstanding taxes on his account. Rick paid the 2005 and 2006 balances on September 9, 2014. (Pl. Ex. 27 & 34.)

The Lyerlys filed the current action in this Court seeking a refund of overpaid taxes, a declaration of the proper tax liability and an order requiring the IRS to retransfer the allegedly misallocated payments. They also seek compensatory damages for mental anguish as well as punitive damages.

## II.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In prosecuting a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III. Discussion

### A. Jurisdiction and Relief

The Lyerlys request that the Court order the IRS to transfer funds to accounts for specific years and determine the proper amount of taxes owed for each of those years. They also request a refund for overpayment of taxes plus interest, as well as compensatory and punitive damages.

However, "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). These terms "must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States*, 352 U.S. 270, 276 (1957). The United States may be sued for a tax refund under 28 U.S.C § 1346, which states that "[t]he district courts shall have original jurisdiction . . . of . . . [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority."

A taxpayer may also sue for the sum of "actual, direct economic damages sustained . . . as a proximate result of the reckless or intentional or negligent actions of the officer or employee and . . . the costs of the action" under 26 U.S.C. § 7433. While the Eleventh Circuit has not yet published a decision interpreting this statute, the Fifth Circuit has, and this Court will look to that circuit's law for guidance. According to the Fifth Circuit, a successful suit under this statute requires "a taxpayer [to] establish that the Government recklessly or intentionally disregarded a provision of the Code in connection with the collection of

federal taxes." *Gandy Nursery, Inc. v. United States*, 412 F.3d 602, 605 (5th Cir. 2005) ("*Gandy II*"). This statute is limited to damages for "unauthorized collection actions." 26 U.S.C. § 7433. It does not provide a remedy for improper assessment of taxes. *Gandy II*, 412 F.3d at 607.

The Fifth Circuit explained the difference between proving a case for improper "collection" as compared to improper "assessment" of taxes in *Shaw v. United States*. 20 F.3d 182, 184 (5th Cir. 1994). It clarified that in order to show "improper assessment, a taxpayer must demonstrate why no taxes are owed," while "to prove a claim for improper collection practices, the taxpayer must demonstrate that the IRS did not follow the prescribed methods of acquiring assets." *Id.* One taxpayer can bring both of these claims, but this "does not affect the separate and distinctive nature of each claim." *Id.*

In *Gandy II*, the IRS was found to have reassessed abated penalties without notice or demand. 412 F.3d 602 at 605. The court found that these violations of proper procedure "specifically focus on the reassessment of . . . tax penalties without notice, not the means by which the Government attempted to thereafter collect on those monies it believed were owed." *Id.* In this case, the Lyerlys claim that their penalties were improperly assessed. While they can bring suit for a

refund under 26 U.S.C. § 7422 and 28 U.S.C. § 1346, they cannot sue for damages based on that alleged improper assessment. The Lyerlys do argue that the IRS failed to follow *assessment* procedures. There is no claim that the IRS disregarded proper *collection* procedures. Instead, the allegations are that the Lyerlys do not owe these penalties. Thus, the Lyerlys' only possible remedy in this action is a refund of overpaid taxes and the Court will treat this action as a refund action.

### B. Assessment of Penalties

The Court has authority to decide if the Lyerlys are entitled to a refund for the alleged wrongfully assessed penalties for failure to file tax returns for the years 2005-2007. The United States asserts that these penalties are mandatory, and therefore, not wrongly assessed. Conversely, the Lyerlys allege that because their failure to file was due to reasonable cause and not due to willful neglect, the penalties should not have been assessed. The relevant statute states that "unless it is shown that such failure [to file a return] is due to reasonable cause and not due to willful neglect, there *shall* be added . . . 5 percent for each additional month or fraction thereof during which such failure continues." 26 U.S.C. § 6651(a)(1). The burden of proving reasonable cause ultimately lies with the taxpayer, who must prove "(1) that the

failure did not result from 'willful neglect', and (2) that the failure was 'due to reasonable cause.'" *United States v. Boyle*, 469 U.S. 241, 245 (1985).

Reasonable cause for failure to file exists if "the taxpayer 'exercised ordinary business care and prudence,' but nevertheless was unable to file the return on time." *In re Sanford*, 979 F.2d 1511, 1514 & n.8 (11th Cir. 1992) (quoting Treas. Reg. § 301.6651-1(c)(1)). Alternatively, a "court may find reasonable cause . . . if a taxpayer convincingly demonstrates that a disability beyond his control rendered him unable to exercise ordinary business care." *Id*. This analysis must be conducted for each tax period where penalties were assessed. *Id*.

The Lyerlys claim that they had reasonable cause for not filing their tax returns because Rick had a multitude of health and emotional problems, their office manager had been embezzling from them, and they had relied on their accountant to timely file their returns. According to the Lyerlys, Rick's health problems required him to rely on his accountant and office manager to take care of financial matters such as filing tax returns. A "serious illness" of the taxpayer or his immediate family is considered reasonable cause by the IRS. *Boyle*, 469 US at 245 & n.1. However, "[t]he failure to make a timely filing of a tax return is not

excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing." *Id.* at 242. Yet, in situations where "a taxpayer relied on an attorney or accountant because the taxpayer, was, for some reason, incapable . . . of meeting the criteria of 'ordinary business care and prudence' . . . the disability alone could well be an acceptable excuse for a late filing." *Id.* at 248 & n.6. In cases where elements that may constitute reasonable cause are present, the question of the existence of reasonable cause is a question of fact. *Id.* at 249 & n.8.

Rick's reliance on his accountant and office manager to file the returns does not constitute reasonable cause for his failure to file but a question of fact remains about whether his illness was "serious" enough to excuse Rick's late filing. The United States argues that Rick's illness was not "serious," while the Lyerlys claim that his anxiety was so severe that it rendered him incapable of filing tax returns.

Further, the IRS considers "destruction by casualty of the taxpayer's records or place of business" to be reasonable cause, and "casualty" is defined by the IRS as "an identifiable event that is sudden unexpected, or unusual," such as vandalism. *Boyle*, 469 US at 245 & n.1; Internal Revenue Service Publication 547 at 2. Here, Simeone indisputably

destroyed some of Rick's records. However, it remains a question of fact if this is enough to be "destruction by casualty" and constitute reasonable cause for his failure to file. Because there is a genuine dispute of material fact as to the presence of reasonable cause, the question of whether or not penalties were mandatory in this case is a question for the finder of fact.

### C. Statute of Limitations

The Lyerlys claim that they are owed a refund on the tax penalties that they paid after October 14, 2013, because those penalties were barred by the statute of limitations. The Internal Revenue Code mandates that "the amount of any tax imposed . . . shall be assessed within 3 years after the return was filed." 26 U.S.C. § 6501. Here, the tax returns for years 2005, 2006 and 2007 were filed on October 14, 2010. (Pl. Ex. 15, 28 & 35.) Therefore, any tax for the years 2005-2007 had to be assessed by October 14, 2013, to fall within the statute of limitations. The Lyerlys received letters dated October 3, 2013 from the IRS saying that no penalties for years 2005-2007 had been assessed. However, Rick then received a notice dated October 9, 2013 assessing penalties and interest. The Lyerlys claim that the IRS could not have assessed these penalties on October 9, because the IRS was closed as part of the government shut

down between October 1 and October 17. Thus, the penalties had to have been assessed after October 17. Regardless, the United States points out that the IRS is not required to return collected taxes that were assessed beyond the limitations period "which might have been properly assessed and demanded." *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932) *modified by* 284 U.S. 599 (1932).

In *Lewis*, the administrator of an estate filed a tax return for 1920 in February of 1921. *Id*. at 282. The return reported various deductions, and the payment indicated by the return was submitted to the IRS. *Id*. However, in November 1925, the return was audited, and all deductions except one—for attorney's fees—were disallowed, leaving a deficiency of $7,297.15, which was paid in March 1926. *Id*. In July 1926, the petitioners asked that the $7,297.15 be refunded, claiming that the assessment was barred by the applicable five-year statute of limitations. *Id.* In 1929, the IRS found that the deduction for attorney's fees should not have been allowed, but set out a new computation deducting the state inheritance taxes. *Id*. This computation showed that the taxpayers owed more taxes than they had yet paid. As a result, the request for a refund was rejected. *Id*.

The Court in *Lewis* held that the Commissioner could lawfully refuse

to refund taxes the petitioners had paid because "[w]hile no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax." *Id.* at 283 (quotations omitted). The court went on to hold that "[a]lthough the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded." *Id.*

*Lewis* does not involve the assessment of penalties, which is the issue before the Court in this case. Yet, the Fifth Circuit applied *Lewis* to a case that involved penalties for filing a late tax return. *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1245-47 (5th Cir. 1978).[2] In *Loftin*, a corporation was assessed a 10 percent penalty for a late filing of its 1961 tax return. *Id.* at 1245. When, in 1962, the corporation filed for a refund of some of the 1961 taxes based on carryback of losses suffered in 1962, the Commissioner audited the 1961 return and disallowed several of the deductions that the corporation had claimed.

---

[2] All decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

*Id.* The disallowance of these deductions increased the corporation's taxable income for 1961, and therefore, when the penalty was applied to the amount of taxable income, the taxes owed for that year increased. *Id.* The Commissioner then used the newly calculated taxes for 1961 as a set off against the refund due from the 1962 losses. *Id.*

The corporation brought suit, claiming that the higher penalty amounted to "additional" taxes, which are barred by the three year statute of limitations. *Id.* (citing 26 U.S.C. § 6501). However, the court held that the "assessment, as a set-off against a refund, does not represent the imposition of an additional or new tax" because "the delinquency penalty already was in existence prior to the 1962 return [as] the 1961 return was filed late." *Id.* at 1247. The court further explained that the increased penalty "did not arise because the Commissioner, in 196[2], suddenly discovered items that had not been reported properly. Had those items been discovered in 1961, the amount owing under the late filing penalty would have been increased." *Id.*

The United States also relies on *Allen v. United States*, which similarly affirmed the denial of a request for a refund by a taxpayer. 51 F.3d 1012 (11th Cir.1995). In *Allen*, the taxpayer was convicted of willful failure to pay taxes for the years 1975 and 1976. *Id.* at 1013. In 1985, the

IRS assessed fraud penalties for Allen's failure to pay, which he paid but quickly requested a refund. *Id*. In 1990, based on case law holding that fraud penalties were improper for cases such as Allen's, the IRS decided to refund Allen the fraud penalties. *Id*. However, it offset the refund "by imposing, instead, delinquency and negligence penalties." *Id*. Allen brought suit, claiming that the delinquency and negligence penalties were barred by the statute of limitations. *Id*. The court, however, held that the reasoning in *Lewis* applied because "penalties . . . shall be assessed, collected, and paid in the same manner as taxes . . . [and that any] reference . . . to 'tax' imposed . . . shall be deemed also to refer to . . . penalties." *Id*. at 1015 (quoting 26 U.S.C. § 6659). Thus, according to the court, if *Lewis* allowed tax premiums collected after the limitations period to be retained by the IRS, then penalties asserted and collected after the limitations period can also be retained. *Id.*

In the case before the Court, the penalties were not imposed as the result of an audit. Yet, like in *Loftin*, the Lyerlys filed their tax return late. Therefore, the reasoning in *Loftin*, which states that "the . . . penalty already was in existence . . . as the . . . return was filed late" is applicable. 577 F.2d at 1247. No matter when the IRS assessed the penalty, it was not "new" based on *Loftin* and *Lewis*, because the

penalties "[were] already . . . in existence" and "might have been properly assessed and demanded" before the statute of limitations expired. *Id.*; *Lewis*, 284 U.S. at 283. The date of the assessment of these penalties is irrelevant, because they were already collected and can be retained by the IRS whether or not their assessment was barred by the statute of limitations. Thus, the Lyerlys are not entitled to summary judgment in their favor based on their claim that the penalties were barred by the statute of limitations.

### D. Procedural Requirements and Estoppel

The Lyerlys assert that the penalty assessments were invalid because the IRS failed to follow the proper procedural requirements of the applicable statutes and regulations. They also claim that the IRS should be estopped from claiming penalties and interest that are greater than the original amount they claimed in early communications with the Lyerlys. As explained above, the Court in this case can only provide the remedy of a refund of overpayment as authorized under § 1346. *Lewis* makes it clear that a taxpayer is only entitled to a refund if the taxpayer has overpaid his taxes. 248 U.S. at 283; *see also Leves v. Commissioner* 796 F.2d 1433, 1435 (11th Cir. 1986)("[R]emedies for the allegedly wrongful assessment are to bring a bring a timely suit in the tax court

under . . . § 6212 . . . or pay the tax and sue for a refund in district court . . . under § 1346."). In a refund suit such as this one, "the taxpayer bears the burden of proving the amount he is entitled to recover." *United States v. Janis*, 428 U.S. 433, 440 (1976). This burden is met if a taxpayer shows that "the amount he paid to the IRS 'exceed[s] the amount which might have been properly assessed and demanded.'" *United States v. Ryals*, 480 F.3d 1101, 1109-10 (11th Cir. 2007) (quoting *Lewis*, 284 U.S. at 283).

Thus, the Lyerlys bear the burden of showing that there has been an overpayment and the procedural issues or early communications that they bring up are not relevant in making this determination. None of this evidence changes the substantive determination of the amount of taxes owed. In *Ryals*, the court held that the taxpayer did not meet his burden of proof because he did "not claim that he paid any taxes in excess of the amount(s) properly due or that he does not owe the taxes." 480 F.3d at 1110. The Lyerlys' procedural concerns and estoppel allegations do not show that they did not owe these taxes. Further, various courts have held that procedural or administrative errors are not enough to show that a taxpayer is entitled to a refund. *See Janis*, 428 U.S. at 440; *see also Blansett v. United States*, 283 F.2d 474, 479 (8th Cir. 1960); *Decker v.*

*Korth*, 219 F.2d 732, 739 (10th Cir. 1955); *Thomaston Cotton Mills v. Rose*, 62 F.2d 982 (5th Cir. 1933). Therefore, the Lyerlys are not entitled to summary judgment in their favor based on the alleged procedural deficiencies in the IRS's assessment of penalties or on their reliance on IRS letters.

### E. Misapplication of Payments

The Lyerlys claim that the IRS misapplied payments that Rick sent to the IRS, and because of that misapplication, they were charged a higher amount of interest and penalties. As discussed above, the Court has jurisdiction in this matter only to order a refund of any overpayments that the Lyerlys have made. Because the question of whether or not the penalties were mandatory and rightfully assessed is a question of fact, the Court cannot, at this stage, determine if the alleged misapplication of payments resulted in an overpayment. This issue will have to be resolved after the finder of fact decides if the Lyerlys owed the IRS payment for the penalties assessed.

### F. 2008 Penalties

The Lyerlys allege that they are owed a refund of the "failure to file," "failure to pay proper estimated tax," and "failure to pay" penalties which were assessed for the year 2008. The United States

concedes that the Lyerlys are entitled to a credit of $3,862.75 for the failure to file penalty. Therefore, summary judgment in favor of the Lyerlys is due to be granted as to the 2008 failure to file penalties to the extent of $3,862.75.

However, the United States disputes the Lyerlys' claim for a refund of the 2008 failure to pay estimated tax and failure to pay penalties. According to the United States, the Lyerlys' extension only allowed them to file on October 15, 2009, but not to pay on that date. The United States claims that the Lyerlys still had to pay before April 15, 2009. The Lyerlys claim that they paid on time. Automatic extensions give a taxpayer six more months to file a timely return but do not extend the time for payment. 26 U.S.C. § 6081. However, the IRS can also grant six month extensions of time for paying taxes, though these extensions are more unusual. 26 U.S.C. § 6161. The record is unclear as to whether an extension of time for payment was granted, as neither side has presented a copy of the alleged extension, but the Court assumes that the extension granted was an automatic extension for time to file. Therefore, the Lyerlys' motion for summary judgment as to this claim is due to be denied. If an extension to pay their taxes was granted, such should be presented at the trial of this matter.

## IV.    Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment (doc. 27) is due to be GRANTED in part and DENIED in part. Defendant's motion for summary judgment (doc. 29) is due to be DENIED. Plaintiffs' motion to strike (doc. 34) is due to be DENIED AS MOOT. Summary judgment in Plaintiffs' favor as to Plaintiffs' claims for a refund of failure to file penalties for the year 2008 is due to be granted. All other claims remain. A separate order consistent with this opinion will be entered by the Court.

DONE and ORDERED this 3rd day of November 2016.

_____

L. Scott Coogler
United States District Judge